IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

                       Plaintiff,                   Case No. 3:05 CR 807

   -vs-

                                                    MEMORANDUM OPINION

SHAWN QUINNEY,

                       Defendant.

KATZ, J.

This case is again before the District Court pursuant to objections filed by Defendant, Shawn Quinney, to the June 6, 2006, Report and Recommendation of the United States Magistrate Judge. ("R & R") (Doc. No. 19). The Court previously issued an order adopting that R & R on September 20, 2006 (Doc. No. 21); subsequently, after entering a plea of guilty and being sentenced, Defendant filed an appeal with the Sixth Circuit Court of Appeals. On July 19, 2007 the Court of Appeals issued its opinion vacating the decision of this Court with respect to the motion to suppress and remanding the same to this Court for re-examination of the Magistrate Judge's conclusions. The reason for the action by the Court of Appeals was that the previous order of this Court indicated the application of a "clearly erroneous or contrary to law" standard of review as contrasted to the required standard of review with respect to motions to suppress, a *de novo* review. (See Court of Appeals opinion in Case No. 07-3190 dated July 19, 2007).

This Court has now undertaken a *de novo* review of the Magistrate Judge's R & R referred to above in accordance with *United States v. Curtis*, 237 F.3rd 598, 603 (6th Cir. 2001) and *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981). Among those documents reviewed in depth by this

Court are the following: Defendant's motion to dismiss of January 27, 2006 (Doc. No. 9); the pretrial memorandum of Defendant with regard to that motion, filed April 7, 2006 (Doc. No. 13) and the response thereto by the Government, filed May 3, 2006 (Doc. No. 17); the transcript of the hearing before the Magistrate Judge on February 28, 2006, which transcript was filed on March 28, 2006; the Magistrate Judge's R & R of June 2, 2006 (Doc. No. 18); the objections to that R & R filed by Defendant on June 12, 2006 (Doc. No. 19) and the response thereto filed by the Government on July 6, 2006 (Doc. No. 20); and the Court's previous order adopting the R & R issued September 20, 2006 (Doc. No. 21). For the reasons which follow, the Court finds that Plaintiff's objections to the R & R are not well taken and the same will be denied.

**BACKGROUND**

The Court of Appeals succinctly summarized the background of this case as follows:

In the fall of 2005, the United States Secret Service identified Quinney as potentially involved in the passing and printing of counterfeit United States currency. Pursuant to their investigation, on September 27, 2005, Secret Service agents went to his home in Toledo, Ohio and he consented to talk with them outside.[1] During the interview, Quinney admitted to passing the counterfeit currency, but denied any involvement in printing it. Following this discussion, the agents obtained Quinney's consent to search his upstairs bedroom. The agents also obtained consent to search from Quinney's stepfather, Chris Jacobs, who was the owner of the house. (Quinney was nineteen years old at the time of the suppression hearing. Although it is not entirely clear from the record, one can assume that he was either eighteen or nineteen at the time of his encounters with the agents and their seizure of his printer.) The search of Quinney's bedroom revealed a printer/scanner/copier machine, but the agents did not seize it at this time. No sooner had the agents departed, however, they received a radio communication from another agent who toled themhe had just interviewed someone who said that Quinney was the "printer" of the currency. Thus the agents returned to Quinney's home approximately two hours later to re-interview him. Upon learning from Jacobs that Quinney had stepped out, the agents told Jacobs they "would have to seize" the printer/scanner/copier from Quinney's bedroom. Jacobs consented to the seizure, although he later testified that he did not feel as if he had much of a choice in the matter because the agents made a command, not a request, for the printer. The agents then looked fro Quinney in the neighborhood, found him, and re-

> interviewed him in their car. During this second interview, when confronted with the agents' newly acquired information, Quinney admitted to having printed counterfeit currency, both orally and in a written statement. Quinney was not Mirandized at either of these first two interviews.
>
> On October 4, 2005, Quinney was interviewed for a third time. The interview took place at the agents' office. According to the government, Quinney was Mirandized despite being told, as he had been during the two prior interviews, that he was not under arrest. Quinney contests this assertion, arguing that at no time during the third interview was he read his *Miranda* rights. During the third interview, Quinney wrote out a one-page supplement to his written statement of September 27, and he also identified the particular counterfeit notes that he had manufacture.
>
> On December 7, 2005, Quinney was charged in a two-count indictment for: (1) manufacturing counterfeit currency in violation of 18 U.S.C. § 471, and (2) uttering counterfeit currency in violation of 18 U.S.C. § 472. \*\*\*
>
> ---
>
> [1] Perhaps not surprisingly, the parties dispute just how 'consensual' this encounter really was. Quinney testified at the suppression hearing that he did not feel free to get out of the agents' car during the interview. In contrast, the agents testified that they had in fact offered to conduct the interview in Quinney's house in the presence of his mother and stepfather, yet quinney 'didn't want his parents to know what was going on' and thus requested that the interview be conducted outside the house in the agents' car.

Court of Appeals Opinion, pp. 2-3.

On December 19, 2005 Defendant entered a plea of not guilty at to Counts 1 and 2 of the indictment and was released pursuant to an order setting conditions of the bond and release. After a period during which discovery was had by both the Government and the Defendant, a motion to suppress was filed on January 27, 2006 (Doc. No. 9) and referred to Magistrate Judge Vernelis K. Armstrong. Judge Armstrong, subsequent to an evidentiary hearing on the motion to suppress, issued an R & R denying the motion to suppress. Defendant filed objections to that ruling on June 12, 2006 (Doc. No. 19), the Government filed its response on July 6, 2006 (Doc. No. 20) and the Court adopted the Magistrate Judge's ruling. Quinney then entered a conditional plea of guilty as to each count of the indictment, preserving the right of appeal on the basis of the denial of his

3

motion to suppress. On February 16, 2007, Defendant was sentenced to a term of five months imprisonment to be followed by three years of supervised release.

**FACTS ELICITED AT THE SUPPRESSION HEARING**

A review of the transcript of the hearing on the motion to suppress reflects that the evidence adduced at that hearing is as set forth in that section of the Magistrate Judge's "Findings of Fact" commencing on page two of her R & R and ending on page 10 thereof. Briefly recounted, after the Secret Service commenced an investigation of Quinney on or about September 16, 2005, two agents interviewed him on September 27, 2005 at his home, at which time the Defendant gave an oral statement to those two agents. The agents then conducted a warrantless search of Defendant's room, left and returned a couple of hours later to conduct a second interview during which Quinney executed a written statement. A subsequent warrantless search was conducted at which time the agents seized a printer/scanner/copier. Defendant was interviewed a third time at the Secret Service office in Toledo on October 4, 2005, at which time he provided a third oral statement and amended his first written statement with a one-page addendum. The foregoing statements and the searches which occurred on September 27, 2005 without a warrant were the subject of the motion to suppress (Tr. 3-5).

At the hearing on the motion to suppress, the Government offered testimony of the two Secret Service agents, Adam Lander and Gregory Patton. Each described their background, including service as special agents with the Secret Service. SA Lander testified that the agents went to the home of the Defendant on September 27, 2005, knocked on the door of the residence and were greeted by the Defendant's stepfather, Chris Jacobs, Sr., at which time they identified themselves as Secret Service agents conducting an investigation. They asked to speak to the

Defendant. When Quinney came to the door, they again identified themselves and requested him to speak to them concerning their ongoing counterfeit money investigation. SA Lander indicated that Quinney agreed, but wanted to talk to them outside the presence and hearing of his parents. Ultimately, the agents and the Defendant went to the agents' car for an interview which lasted between 45 minutes to an hour.

The testimony then reflects that the agents sought permission from Mr. Jacobs to search his residence and obtained Quinney's permission to search his room. The search of the bedroom was conducted by SA Patton, but no items were taken from the residence or from Defendant's bedroom at that time.

After leaving Defendant's residence and learning from another special agent that the Defendant had been identified by another suspect as the maker of the counterfeit notes which had been passed by another suspect earlier in the day, the agents returned to the Defendant's home for a second visit about 2 hours after they had concluded the first visit. Again, Mr. Jacobs, Sr. answered the door and was advised by the agents that they wanted to re-interview Quinney and would have to seize the printer located in his bedroom. Jacobs agreed. (TR. p. 10). Jacobs led SA Lander to the Defendant's bedroom where Jacobs disconnected the printer and took it downstairs. (The testimony on this is in conflict). That printer/scanner/copier was transported to the Secret Service office in Agent Patton's vehicle. Lander testified on cross-examination that he obtained Defendant's permission to take the printer after they located him the second time (TR. P. 27) and that they also had the consent of his stepfather to the search.

Because Defendant was away from his home at the time of the agents second visit, they found him down the street and asked for another interview, which occurred in their car. He made

5

an oral statement and a written statement and no *Miranda* warnings were given, nor was he placed under arrest.

The next contact by the agents with the Defendant occurred by telephone October 4, 2005 when he was asked to come to the office of the Secret Service to answer additional questions. He did so and when he arrived at that office, he was advised by SA Lander of his *Miranda* warnings and further advised that he was not under arrest. Quinney acknowledged that he understood his rights and thereafter made another oral statement and written statement which was a one-page addendum to his September 27th written statement. The interview lasted approximately one-half hour.

The testimony of SA Gregory Patton, the resident agent in charge of the United States Secret Service office in Toledo, Ohio, fairly well mirrored and tracked that of SA Lander.

Defendant's mother and stepfather testified on behalf of the Defendant. A review of the testimony of Mr. & Mrs. Jacobs reveals little variation from the testimony of the Secret Service agents except when told by the agents that they had to confiscate the printer for evidence, Mr. Jacobs testified that he did not assist them in removing the printer and felt that he had no choice to refuse their taking the printer due to the fact that they were government agents. He testified that they made only one trip upstairs to Quinney's bedroom and that he accompanied them and that they took the computer and a bag of trash. (Tr. p. 93). Quinney testified that he was not advised of his rights during the first two meetings with the agents and denied giving them permission to take his computer. When interviewed at the office of the Secret Service on October 4, he testified that he did not feel free to leave and thought he was being arrested. (Tr. p. 104) He specifically denied being given *Miranda* warnings at that meeting.

6

The Defendant contends that the Secret Service agents lacked consent to search his bedroom and seize his computer, scanner/printer/copier from that room. Therefore, he argues that his resulting statements must he suppressed. The Government, on the other hand, argues that a valid consensual search occurred on September 27, 2005, that the seizure was lawful and that the subsequent statements were not tainted by an illegal search and seizure.

**LEGAL ANALYSIS**

Defendant was charged in this case with one count of manufacturing counterfeit Federal Reserve Notes in violation of 18 U. S.C. § 471 and one count of uttering a confederate obligation in violation of 18 U.S.C. §§ 2 and 472. The Defendant's motion to suppress was directed at all evidence obtained as a result of the search of his bedroom and any and all statements made by the Defendant to Secret Service agents on multiple occasions.

As outlined above, both Secret Service agents involved in the investigation related to this Defendant and the search his bedroom testified at the suppression hearing. The Defendant testified, as did his stepfather and mother, who were present at various times during contacts made by the agents at their home, including the taking of Defendant's computer and printer from his bedroom. A review of the transcript of the suppression hearing leads this Court to the same conclusion as reached by the Magistrate Judge; the more credible evidence appears to have been presented by the Government through the two Secret Service agents when compared with that offered by the Defendant. Obviously, the judge who presided at the hearing and heard testimony from the mouths of witnesses has the better opportunity to judge credibility of witnesses. However, in reviewing the transcript, admittedly a "cold copy" of that testimony, and comparing the testimony of Government witnesses to that of defense witnesses, the Court is driven to the

7

same conclusion as the Magistrate Judge that the Secret Service agents' detailed description of contacts with the Defendant and his parents is more credible than that of the parents and the Defendant. That does not foreclose a determination that the atmosphere surrounding a search may have been coercive or threatening, or that the Defendant or his stepfather understood that they had the right to refuse to give consent to either discussion of the Defendant's involvement in the alleged crime or a search of his bedroom. The transcript does not reflect that the agents ever advised the Defendant or his stepfather of their individual right to refuse such consent. However, the testimony reveals that the Defendant offered to show the agents his bedroom and the computer and that his stepfather was the individual who cooperated in the initial search of that bedroom. Therefore, it does not appear to this Court that the lack of instruction by the Secret Service agents of the right to refuse consent overrides the conclusion as to the voluntariness of that consent.

With regard to discussions between the Defendant and the agents, the testimony as set forth in the transcript does not reveal that the officers used coercive or threatening techniques or language at any time during their interaction with Shawn Quinney. None of the three defense witnesses, the Defendant, his mother or his stepfather, presented any testimony that would reflect that they were threatened or intimidated during the visits by the agents.

The testimony and the "totality of circumstances" reflects that the initial search was conducted with the voluntary consent of both the Defendant and Mr. Jacobs. However, the undisputed testimony reflects that SA Lander told Mr. Jacobs that he *had* to seize the printer, which in the opinion of this Court taints the second search which resulted in the seizure of the printer, as Jacobs could reasonably believe that he had no option except to comply with Lander's directive/request. Lander's testimony was that he seized the computer/printer and did not receive

consent from Quinney until *after* the taking. There is no question that the computer was owned by the Defendant Quinney, who had not consented to its taking at or prior to the time when it was removed from his bedroom and residence,.

As before the Magistrate Judge, the Government asserts that the original consent supports both searches and the seizure of the computer. The case upon which the Government relies, *U.S. v. Jones*, 62 F.3rd 851 (6th Cir. 1995) is clearly distinguishable from the case at bar since in *Jones* the Defendant had executed a written consent to the search of his car and had knowledge that the same was in lawful police custody. Therefore, he had no legitimate expectation of privacy in the automobile.

An analysis of the evidence and the law leads this Court to the same conclusion as reached by the Magistrate Judge, that the second search of Quinney's residence and the seizure of his computer were not made pursuant to a valid consent and such evidence is inadmissible. It is Hornbook law that the exclusionary rule bars that admission of items seized during an unconstitutional search. As an exception to the exclusionary rule the Government urged the Magistrate Judge to apply the "inevitable discovery" doctrine as explained by the Supreme Court in *Nix v. Williams*, 104 S.Ct. 2501, 2509 (1984). In order that the "inevitable discovery" doctrine may be applied, it must be demonstrated by the Government that the evidence inevitably would have been acquired through lawful means had the Government's misconduct not occurred. As noted by the Defendant, "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *United States v. Eng*, 971 F.2d 854, j861 (2nd Cir. 1992), *cert. denied*, 114 S. Ct. 693. The Defendant also cites in his objections to *United States v. Johnson*, 22 F.3rd 674

9

(6th Cir. 1994) ("to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment." ).

The Magistrate Judge distinguishes the case *sub judice* from other cases, including *Johnson*, because in the case at bar the agents had obtained independent evidence that the Defendant here was the printer of the counterfeit currency. That testimony appears from the transcript of the hearing as clear and unequivocal; the testimony revealed that the investigation by the Secret Service had located two witnesses, including Quinney's own brother, who said the Defendant was the printer of the counterfeit currency.

Based upon a review of the case law and the testimony elicited at the suppression hearing, this Court finds that it agrees with the Magistrate Judge with respect to the inevitable discovery doctrine as applicable to this case. Given the significant experience of the agents and the possession by the agency (and therefore by the agents) of the independent evidence concerning the involvement of Quinney in the printing of the bogus bills, a search warrant would ultimately have been obtained. Therefore, the Court finds that the inevitable discovery doctrine is applicable and that it obviates the application of the exclusionary rule which, in the absence of that doctrine, would have required the exclusion of said evidence.

The Defendant also asserts in his memorandum supporting his objections to the R & R "that his statements to the agents are a direct and proximate result of the agents' illegal seizure of the printer, unattenuated by any intervening circumstance, and therefore constitute illegal fruits of the governmental misconduct. It was only after the agents had advised Defendant that they had his printer and that it would be sent to 'forensics' that he admitted to manufacturing." The

Government responds that the seizure of the printer was not relevant because in the first interview Quinney denied any role in the printing or distribution of the bogus bills. Thereafter, the agents obtained new information <u>prior</u> to the seizure of the printer/scanner/copier. It was the new information that necessitated in the minds of the agents the need to re-interview Quinney. The credible testimony of **both** agents was that the Defendant came to their office voluntarily, made statements on October 4th after being advised of his *Miranda* warnings which were read from a Secret Service form, and that the Defendant's statements were made subsequent to the additional statements of two witnesses (including Defendant's brother) who implicated Quinney in the printing of counterfeit currency. Therefore, the cases cited by the Defendant in the memorandum in support of objections to the R & R are inapplicable to the case at bar.

**CONCLUSION**

Based upon the foregoing discussion, the Court finds that the motion to suppress filed by the Defendant should be denied, and that the Magistrate Judge's R & R should be, and, is adopted. The Defendant's objections to that R & R are denied.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE